**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant.**

**Civ. A. No. J82–0186(B).**

United States District Court,
S.D. Mississippi,
Jackson Division.

Sept. 9, 1983.

Katie J. Monroe, Trial Atty., Jerome C. Rose, Regional Atty., E.E.O.C., Birmingham, Ala., for plaintiff.

Jimmie B. Reynolds, Jr., Steen, Reynolds, Dalehite & Currie, Jackson, Miss., Kalvin M. Grove, Fox & Grove, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BARBOUR, District Judge.

On Friday, August 18, 1983, this Court issued a Summary Order granting summary judgment for the Defendant, Allstate Insurance Company. This Memorandum Opinion is written pursuant to that order and incorporates the same.

1. 29 U.S.C.A. § 206.

2. The EEOC's authority to sue is alleged to exist by virtue of 29 U.S.C.A. §§ 216 and 217

On April 14, 1982, the Equal Employment Opportunity Commission (hereafter EEOC) sued to enforce the Equal Pay Act. The EEOC alleged that it had authority to enforce the Equal Pay Act[1] pursuant to Section 1 of Reorganization Plan No. 1 of 1978, 92 Stat. 3781, which amended 29 U.S.C.A. §§ 216(c) and 217. Reorganization Plan No. 1 of 1978 was "enacted" pursuant to the Reorganization Act of 1977, 5 U.S.C.A. Section 901, *et seq.*

The present motion for summary judgment made by Allstate places before this Court the legal question of whether or not the EEOC has the authority to enforce the Equal Pay Act by the initiation of litigation.[2] There are no genuine issues of material fact with regard to the matters presented by this motion; therefore, it is appropriate to decide the issue of law by summary judgment.

## ONE–HOUSE VETO

The basis of Allstate's motion for summary judgment relates to the one-house veto provision contained in the Reorganization Act of 1977. Under this Act the President was granted the authority to present reorganization plans to Congress which either House of Congress could veto by a resolution passed by a majority vote. Reorganization Plan No. 1 of 1978 was not objected to by either House and therefore was "enacted" into law. Section 1 of this Plan transferred the enforcement of the Equal Pay Act from the Labor Department to the EEOC. See 1978 *U.S.Code Cong. & Ad. News* 9799 (reprint of Reorganization Plan No. 1 of 1978).

In a recent United States Supreme Court decision the question of the constitutional validity of one-house veto provisions was decisively resolved. The motion before this Court for summary judgment is based on this decision and the determination of its effect under the facts presented here.

whereby the Secretary of Labor may bring an action to enforce 29 U.S.C.A. § 206.

## CHADHA

On June 23, 1983, the United States Supreme Court announced its decision in *Immigration and Naturalization Service v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). *Chadha* held that the retention by Congress of the power to veto the act of the Attorney General suspending deportation proceedings violated the constitutional doctrines of separation of powers and the constitutional requirement that legislation be accomplished by action by both houses of Congress and by presentment to the President of the United States. *Chadha,* —— U.S. at —— – ——, 103 S.Ct. at 2779–2783. The Supreme Court's exhaustive analysis of the history behind Article I and its limit on the exercise of legislative power are unnecessary to repeat.[3] Congress may *legislate* and grant certain power, but it may not *revoke* that power granted without *legislating* again.[4] In *Chadha* the Supreme Court found that the one-house veto provision not only violated the bicameralism and presentment requirements of the Constitution, but also infringed upon the doctrine of separation of powers.[5]

## STANDING

The EEOC asserts a standing argument which, if sustained, would preclude summary judgment.

The EEOC alleges that Allstate does not have standing to challenge the constitutionality of the Reorganization Act of 1977 by claiming that Allstate was not injured by that Act, even if it is unconstitutional.

It is beyond dispute that every defendant has standing to question the legal authority of the plaintiff to sue. The EEOC has attempted to turn Allstate's defense into an offensive weapon by questioning Allstate's standing to assert the alleged constitutional infirmity as a defense. Clearly Allstate has standing to challenge the plaintiff's legal right to sue, but assuming arguendo, that standing is not self-evident in this case this Court will address the merits of the EEOC's standing argument.

The EEOC claims that Allstate has no injury such as may satisfy the standing requirements of Article III of the Constitution. The Article III requirement of standing was recently summarized by the Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) as follows:

At an irreducible minimum, Art. III requires the party who invokes the Court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be

---

**3.** The Supreme Court took great care to emphasize the difficulty of their decision in light of the efficiency and proliferation of the one-house veto as a tool of government. It is clear that their decision goes to the bedrock of our Constitution and examines the reasons for their limitations on the exercise of legislative power.

**4.** There are exceptions to the requirement that bills must be passed by both Houses and presented to the President:

There are but four provisions in the Constitution, explicit and unambiguous, by which one House may act alone with the unreviewable force of law, not subject to the President's veto:

(a) The House of Representatives alone was given the power to initiate impeachments. Art. I, § 2, cl. 6;

(b) The Senate alone was given the power to conduct trials following impeachment on charges initiated by the House and to convict following trial. Art. I, § 3, cl. 5;

(c) The Senate alone was given final unreviewable power to approve or to disapprove presidential appointments. Art. II, § 2, cl. 2;

(d) The Senate alone was given unreviewable power to ratify treaties negotiated by the President. Art. II, § 2, cl. 2.

Clearly, when the Draftsmen sought to confer special powers on one House, independent of the other House, or of the President, they did so in explicit, unambiguous terms.

*Chada,* —— U.S. at ——, 103 S.Ct. at 2786. Other limited exceptions were noted, *Id.* at n. 20.

**5.** *Id.* 103 S.Ct. at 2787.

traced to the challenged action" and "is likely to be redressed by a favorable decision". *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976). In this manner does Art. III limit the federal judicial power "to those disputes which confine Federal Courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." (citations omitted).

Allstate has shown that it has personally suffered actual injury in that it has been subjected to a law suit filed pursuant to an unconstitutional statute. There is no doubt that a favorable decision by this Court would redress the injury of which Allstate complains. The identification of this injury to the allegedly unconstitutional passage of the Reorganization Plan No. 1 of 1978 is obvious insofar as the EEOC would have no legal authority to engage in litigation for the purpose of enforcing the provisions of the Equal Pay Act without a constitutional delegation of power from Congress. Therefore, the injury of Allstate in that it is subject to litigation[6] at the instance of a governmental agency whose authority to institute such litigation is being questioned on constitutional grounds meets the Art. III requirements of injury in fact which is traceable to the alleged illegality and which will be redressed by a favorable decision.[7]

---

**6.** Allstate has submitted an uncontroverted affidavit outlining the scope and effect which this suit has had on its operation as a business as well as the expense it has incurred in its defense.

**7.** The EEOC has asserted that Allstate would have been subject to suit by the Labor Department if the responsibility for enforcing the Equal Pay Act had not been transferred to the EEOC. This is speculation on the part of the EEOC and there is no evidence which has been submitted to this Court to substantiate such allegations. This Court may not engage in speculation as to what the Department of Labor would do if it were charged with enforcing the Equal Pay Act.

**8.** The Constitution sets forth the "prescription for Legislative action: passage by a majority of

## UNCONSTITUTIONALITY OF THE ONE–HOUSE VETO

Any use of a legislative veto scheme which has the effect of enacting laws without complying with the Constitutional prescription for legislation is unconstitutional.[8]

### I.

The first issue to decide is whether the action complained of here was "essentially legislative in purpose and effect." *Chadha,* —— U.S. at ——, 103 S.Ct. at 2784. The reorganization accomplished under the Plan altered the legal status of agencies and of individuals, including Allstate, by transferring enforcement functions of the Equal Pay Act from the Department of Labor to the EEOC. Such reorganization of the Executive Branch is a legislative function.[9] The reorganization became published law just as though it had been introduced into Congress as a regular bill and thereafter passed by both Houses and not vetoed by the President.

This Court must conclude that the reorganization was essentially legislative in its purpose and effect.

### II.

This conclusion takes us to the second issue: Does the fact that no veto was interposed alter the requirements of bicameralism and presentment?

---

both Houses and presentment to the President." *Chadha,* —— U.S. at ——, 103 S.Ct. at 2787.

The EEOC urges that since both Houses of Congress rejected a veto of the Reorganization Plan, the "enactment" was constitutional. A resolution to disapprove the Plan was introduced in the House and defeated, but the Senate never acted on a similar resolution. *See* 124 *Cong.Rec.* 1136–37 (1978) (house vote to disapprove resolution objecting to plan); *S.Rec. No.* 750, 95th Cong., 2nd Sess. 1 (1978) (committee report approving plan; no vote on the floor was taken).

**9.** Representative Brooks noted that "[d]etermination of the organizational structure of the executive branch is a legislative function. Make no mistake about that." 124 *Cong.Rec.* 9344 (1977).

■ The question presented by this case is not directly answered in *Chadha*. *Chadha* did emphasize the importance of preserving the separation of powers between the executive and legislative branches of government.[10] Moreover, the Court noted that "[t]o allow Congress to evade the strictures of the Constitution and in effect enact Executive proposals into law by mere silence cannot be squared with Art. I." *Chadha*, —— U.S. at —— n. 22, 103 S.Ct. at 2787 n. 22. It is evident from the opinion in *Chadha* that "every use of the legislative veto" is invalid.[11]

■ The fundamental problem with the legislative retention of veto power is that it places the executive in the position of legislating subject to a Congressional veto.[12] In this sense it stands Art. I of the Constitution on its head. Congress has various tools by which it may control its grant of power, but "Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." *Id.* 103 S.Ct. at 2786. Because the Court in *Chadha* clearly sweeps with a broad stroke in its holding that the legislative one-house veto is unconstitutional, this Court must follow that precedent[13] by holding that a retained one-house veto is unconstitutional even when not exercised.

### III.

■ The EEOC has argued that the constitutional issue is not ripe for decision because no veto power was exercised by Congress. The EEOC cites *Clark v. Valeo*,[14] 559 F.2d 642 (D.C.Cir.1977) (*en banc*), a case in which no veto was exercised. The Court in *Clark v. Valeo* states that "[a] contention that there are no real considerations of ripeness here can rest on a view of the merits that a one-house veto is so patently unconstitutional that nothing more is needed to inform the judgment of this Court." *Id.* at 649.

The Court in *Clark v. Valeo* relied on Justice White's concurring opinion in *Buckley v. Valeo*, 424 U.S. 1, 257–86, 96 S.Ct. 612, 744–58, 46 L.Ed.2d 659 (1976) (White, J., concurring) where he concluded that the one-house veto provision was constitutional. The Court in its *per curiam* opinion in *Buckley v. Valeo*, did not reach the issue of the constitutionality of the unexercised one-house veto.[15] Justice White *alone* reached the one-house veto finding it constitutional.

**10.** "The bicameral requirement, the Presentment Clause, the President's veto, and Congress' power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps. To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded."
*Chadha*, —— U.S. at ——, 103 S.Ct. at 2787.

**11.** *Id.* (Powell, J. concurring). Justice Powell perceives that the *Chadha* decision is based on broad constitutional doctrines such that every use of the one-house veto is impermissible.

**12.** It has been noted that the presence of a one-house veto makes it necessary to defer to individuals in Congress in formulating proposals because of the increased power of a small minority to achieve a legislative result. *Clark v. Valeo*, 559 F.2d 642, 681 (D.C.Cir.1977) (en banc) (MacKinnon, J. dissenting).

**13.** *See Consumer Energy Council of America v. FERC*, 673 F.2d 425 (D.C.Cir.1982), aff'd, —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413 (1983). The Supreme Court affirmed the Court of Appeals without opinion upholding the decision in *Chadha*.

**14.** *Clark v. Valeo* dismissed the constitutional attack on the one-house veto as unripe. The *Clark* Court held that there were two parts to the statutory scheme in question: first, the statute provided for a laying-over period which was found unconstitutional under *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941); secondly there was a provision that the veto under the laying-over provision might be accomplished by the unicameral or one-house veto. *Clark*, 559 F.2d at 649. The Court determined that the second part of review provision had not come into play because Congress adjourned *sine die* two days prior to the running of the laying-over period during which the veto might have been interposed.

On this basis the constitutional attack on the one-house veto was dismissed as unripe. *Id.* at 650.

**15.** The Supreme Court cites *Buckley v. Valeo* in its *Chadha* decision but does so for general principles of constitutional adjudication and separation of powers, not in the context of addressing the validity *vel non* of the one-house veto.

*Chadha* has intervened at this juncture, and under the theory of the *Clark v. Valeo* court that an adjudication of the constitutionality of an unexercised one-house veto would be ripe only if it were patently unconstitutional, this Court today holds that *Chadha* must be read to say that "[t]o allow Congress to evade the strictures of the Constitution and in effect enact Executive proposals into law by mere silence cannot be squared with Art. I."[16] To rely on Justice White's concurring opinion in *Buckley v. Valeo* at this point would be suspect because Justice White was one of the two dissenters writing to uphold the one-house veto provision in *Chadha*, —— U.S. at ——, 103 S.Ct. at 2791.

This Court is bound by the Supreme Court's decision in *Chadha* and must follow its instruction. The reasons noted in *Clark v. Valeo* for not addressing the constitutional issue presented by the one-house veto, whether it is exercised or not, have evaporated.[17]

## SEVERABILITY

The United States Supreme Court has recently restated the general rule that the invalid parts of a statute are to be severed "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), quoting *Champlin Refining Co. v. Corporation Comm'n*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932). There is no severability clause present in the Reorganization Act of 1977.[18] This Court must then "embark on that elusive inquiry", *Chadha*, —— U.S. at ——, 103 S.Ct. at 2774, to determine "whether Congress would have enacted other portions of the statute in the absence of the invalidated provision." *American Federation of Government Employees v. Pierce*, 697 F.2d 303, 307 (D.C.Cir.1982) quoting *Consumer Energy Council of America v. FERC*, 673 F.2d 425, 442 (D.C.Cir.1982). If the veto provision in Section 906(a) is severable from the rest of the Reorganization Act, then the President's proposal contained in Reorganization Plan No. 1 of 1978 would presumably be an exercise of executive authority delegated under legislative grant. The essential question which must be answered to determine this is whether or not Congress would have delegated such broad authority to the President without reserving for itself the review power which is contained in the one-house veto provision that has been found unconstitutional by this Court under the Supreme Court's decision in *Chadha*.

The Reorganization Act of 1977 re-established for a three year period the authority of the President to submit plans for the reorganization of the executive branch of the government.[19] Congress was aware that the one-house veto which was contained in the statute passed as the Reorganization Act of 1977 was of questionable constitutionality.[20] Although the Attorney

---

**16.** *Chadha*, —— U.S. at —— n. 22, 103 S.Ct. at 2788 n. 22.

**17.** *See Clark v. Valeo*, 559 F.2d at 650 n. 10 (reasons for not reaching the constitutional issue).

**18.** The absence of a severability clause suggests the inseverability of the provision, *see Carter v. Carter Coal Co.*, 298 U.S. 238, 312–13, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936) (in absence of a severability clause, the presumption is against mutilation of the statute and that the statute was intended to be effective in its entirety).

**19.** H.R.Rep. No. 95–105, 95th Cong., 1st Sess. 2, reprinted in 1977 *U.S.Code Cong. & Ad. News*, 41.

**20.** The constitutional issues were discussed at length in the legislative history of this Act. This discussion includes the opinions of constitutional scholars and others. *See* 123 *Cong. Rec.* 9349 (1977) (statement of Rep. Levitas) (arguments against the bill are that it is unconstitutional because it violates the "presentation clause" of the Constitution and that it violates the separation of powers between the executive and legislative branches of government. The representative expressed the view that Justice White's concurring opinion in *Buckley v. Valeo* supports the constitutionality of the veto provision and sets forth other reasons why the veto provision should be upheld and included in the legislation.); H.R.Rep. No. 95–105, 95th Cong., 1st Sess. 9–17, reprinted in 1977 *U.S.Code Cong. & Ad.News*, 49–57 (discussion in legislative history of the constitutional issues in-

General had issued an opinion stating his belief that the veto provision is constitutional,[21] Congress had the benefit of credible advice to the contrary.

In light of these possible constitutional problems an amendment was proposed which purported to restrict the relief which a court might grant to the holding of a single plan unconstitutional instead of all plans which had been passed under that statute.[22] The discussion on this amendment did not even approach the question of whether the one-house veto should be severed from the Act but was focused on whether a court could or would be limited to invalidating one plan instead of all the plans which had been passed by virtue of the one-house veto provision.[23] Evidence that the one-house veto provision was essential to the Congress in enacting the Reorganization Act of 1977 is found in the steps taken by Congress to amend the previous reorganization act to assure that a vote could be taken on each and every plan proposed by the President.[24]

Representative Brooks, one of the sponsors of the Reorganization Act of 1977, stated during floor debate that while "[d]etermination of the organizational structure of the executive branch is a legislative function," the principal issue "to consider here today [is] how much authority the President should have, and what role Congress should play in the reorganization process." [25] Representative Brooks expressed concern over the constitutionality of the veto provision, even to the extent of introducing another bill which did not contain that provision. Representative Brooks explained his position as follows:

> I introduced a reorganization bill that would have met both the objectives of the President and the requirements of the Constitution. Unfortunately, the bill before us today takes a slightly different approach. I have chosen to support it, however, because I believe the new voting procedure—which was taken from my bill—and the limitations on the use of reorganization authority to which the committee agreed, will provide Congress with far more control over reorganization than would have been the case if the President's proposals had gone through unchallenged.[26]

Although not dispositive of the intent of Congress, the statements of one of the legislation's sponsors "deserves to be accorded substantial weight in interpreting the statute." *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96

---

**21.** H.R.Rep. No. 95–105, 95th Cong., 1st Sess. 10, reprinted in 1977 *U.S.Code Cong. & Ad. News,* 50. The opinion states in part:

> [I]f the procedures provided in a given statute have no effect on the constitutional distribution of power between the legislative and the executive—that is, the power of Presidential veto is effectively preserved and the principle of bicameralism is respected—*the fact that the procedure is not explicitly authorized by the language of Art. I is not enough to render the statute unconstitutional.* I am of the opinion that the procedure provided in the reorganization statute for congressional disapproval of a reorganization plan submitted by the President satisfies this test and, therefore, is constitutional. (emphasis added).

**22.** 123 *Cong.Rec.* 9363–9365 (1977).

**23.** *Id.* at 9364.

**24.** "A major objective of the sponsors of this legislation was to develop a procedure under which an opportunity for a vote by Congress will be assured on each plan." H.R.Rep. No. 95–105, 95th Cong., 1st. Sess. 8, reprinted in 1977 *U.S.Code Cong. & Ad.News,* 48.

**25.** 123 *Cong.Rec.* 9344.

**26.** *Id.* The voting procedure to which Rep. Brooks referred is the procedure codified at 5 U.S.C.A. §§ 908 through 912. The procedure is designed to assure that each house will vote on every plan submitted. Essentially, it involved the automatic introduction of a resolution disfavoring the plan and also that such should be sent to the appropriate committee for consideration and if not reported out of committee after forty-five days it would be placed on the appropriate calendar of the House involved. This procedure is designed to guarantee a vote within the sixty day period which Congress has to consider a reorganization plan. *See* H.R.Rep. No. 95–105, 95th Cong., 1st Sess. 8–9, reprinted in 1977 *U.S.Code Cong. & Ad.News* 48.

S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976). Representative Brooks expression that Congress wishes to retain control over the President's activities is almost a foregone conclusion. This is obviously the reason Congress inserted the one-house veto provision in the Act and certainly it would not be suggested that the intent of Congress was to allow the one-house veto provision to be severed giving the President free reign to propose and enact whatever reorganization he desired within the framework of the delegation of power contained in the other sections of the Act.[27] Interestingly enough, the amendment which was proposed including a severability provision was introduced for the purpose of limiting the scope of judicial review to any one plan which might come before a court; this amendment was not introduced to in any way sever the one house veto provision from the remaining parts of the Act.[28]

In summary, there is no doubt that Congress intended the one-house veto provision to be an integral and inseparable part of the entire Act such that it would limit the power of the President to propose and enact reorganization plans. Congress expressed without equivocation its desire to restrict the President's power to reorganize the executive branch. Pursuant to this, the entire Act must be held unconstitutional in that the one-house veto provision was enacted as an integral and inseparable part of the grant of power to the President. It is, of course, unfortunate that Congress chose an unconstitutional means by which to review and restrict the exercise of the authority which it granted to the President.

### RETROACTIVE APPLICATION

The Supreme Court in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) addressed the doctrine of non-retroactivity and its appropriate applications. In that case the Court stated:

> [W]e have recognized the doctrine of nonretroactivity outside the criminal area many times, in both constitutional and nonconstitutional cases. (citations omitted)

In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied non-retroactively must establish a new principal of law, either by over-ruling clear past precedent on which litigants may have relied, ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed, .... Second, it has been stressed that "we must ... weigh the merits and demerits of each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." (citation omitted) Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of non-retroactivity" (citation omitted)

*Chevron Oil Co. v. Huson,* 404 U.S. at 106–07, 92 S.Ct. at 355–56.

To determine whether a decision should be given only prospective application often involves a determination of the interpretation to be placed on statutes under a given set of circumstances.[29] This Court is bound by the recent Supreme Court decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 87, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982). In *Marathon* the Supreme Court invalidated the broad grant of jurisdiction given the bank-

---

**27.** See 5 U.S.C.A. §§ 904 and 905 (setting out parameters within which the President must act in submitting reorganization plans).

**28.** *See supra* notes 22 & 23 and accompanying text.

**29.** *E.g. Valencia v. Anderson Bros. Ford,* 617 F.2d 1278, 1288–90 (7th Cir.1980) *rev'd on other grounds* 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981) (analyzing decisions which bore on the question of the construction of the Truth in Lending Act).

ruptcy courts by statute.[30] In deciding whether the invalidation of this jurisdiction should be applied retroactively, the Court stated "[i]t is plain that Congress' broad grant of judicial power to non-Art. III bankruptcy judges presents an *unprecedented question of interpretation* of Art. III." (emphasis added).[31] The Court also noted the substantial injustice and hardship which would be visited upon those who had relied on the statutory grant of power to the bankruptcy courts.

*Marathon* represented an extreme case where the Supreme Court not only determined that the application of its holding should apply prospectively and not retroactively, but also that it should take effect at a later date. Consistent with that holding they stayed their judgment until October 4, 1982, almost four months after the decision.[32]

It is clear that the decision to deny retroactive application in *Marathon* was based on the pervasive and far-reaching effects of that decision. In contrast, by holding that the Reorganization Act of 1977 is unconstitutional thereby undercutting EEOC's authority to sue, which clearly must rest on a statutory grant of power, this Court decides a narrow and isolated issue, one which is required of it by the United States Supreme Court's decision in *Chadha*.

The three considerations set forth in *Chevron Oil Co. v. Huson* must be decided against prospective-only application of the decision of this Court.

First, this is not a case of first impression and the decision of this Court was definitely foreshadowed by prior events. Not only has the Supreme Court acted in *Chadha,* but it has been obvious in a review of the legislative history that Congress was well aware that such a decision might ultimately invalidate their use of the one-house veto scheme.[33]

Secondly, retrospective operation of this holding will not retard the application of *Chadha* which was clearly envisioned by the Supreme Court in its decision in that case. In fact, to deny retroactive application would encourage the EEOC to pursue other similar suits in spite of its lack of a constitutionally sound grant of statutory authority to do so. The fundamental issue must be addressed by Congress which may vest in the EEOC the statutory authority to sue by appropriate *legislative* action.

Thirdly, there are no individual cases in which retroactive application of this decision would produce inequitable results. The Equal Pay Act includes a provision for individuals to sue in their own right.[34] In spite of the United States Supreme Court's obvious recognition that their decision in *Chadha* would have far-reaching effect, the Court engaged in no discussion and gave no indication that *Chadha* should not be applied retroactively. While their silence on this issue is not dispositive, it is persuasive.

## CONGRESSIONAL RATIFICATION

The EEOC argues that Congress has ratified the transfer of the enforcement function under the Equal Pay Act to the EEOC by its appropriation of funds and other statutory references that have been passed in compliance with the constitutional requirements of bicameralism and presentment. In *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) the Supreme Court held that Congressional ratification of security clearance procedures which were promulgated by the Secretary of Defense without express authorization of either the President or Congress could not be implied from the continued appropriation of funds to finance the program fash-

---

30.  —— U.S. at ——, 102 S.Ct. at 2880.

31.  *Id.*

32.  *Id.*

33.  *See supra* notes 20 through 23 and accompanying text. (Legislative history clearly indicates the continuing concern of many members of Congress over the constitutionality of the one-house veto provision and the advice of legal scholars that such provision would be held unconstitutional).

34.  29 U.S.C.A. § 216(b) (Supp.1982).

ioned by the Department of Defense. In its opinion the Supreme Court stated:

> If acquiescence or implied ratification were enough to show delegation of authority to take actions within the area of questionable constitutionality, we might agree with respondents that delegation has been shown here. In many circumstances, where the Government's freedom to act is clear, and the Congress or the President has provided general standards of action and has acquiesced in administrative interpretation, delegation may be inferred.... Before we are asked to judge whether, in the context of security clearance cases, a person may be deprived to follow his chosen profession without full hearings where accusers may be confronted, it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use. *Cf. Watkins v. United States,* 354 U.S. 178 [77 S.Ct. 1173, 1 L.Ed.2d 1273]; *Scull v. Virginia,* 359 U.S. 344 [79 S.Ct. 838, 3 L.Ed.2d 865]. *Such decisions cannot be assumed by acquiescence or non-action. Kent v. Dulles,* 357 U.S. 116 [78 S.Ct. 1113, 2 L.Ed.2d 1204]; *Peters v. Hobby,* 349 U.S. 331 [75 S.Ct. 790, 99 L.Ed. 1129]; *Ex parte Endo,* 323 U.S. 283, 301–302 [65 S.Ct. 208, 218, 89 L.Ed. 243]. They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, *See Peters v. Hobby, supra,* but also *because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws.* Without explicit action by law makers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them. (emphasis added).

*Green v. McElroy,* 360 U.S. at 506–07, 79 S.Ct. at 1418–19.

Although there is no doubt that Congress has the authority to enact legislation which would vest the power to enforce the Equal Pay Act in the EEOC, "... [i]t must be recognized that there is more than a passing distinction between substantive legislation and appropriation bills." *Pacific Legal Foundation v. Goyan,* 664 F.2d 1221, 1226 (4th Cir.1981). *See Andrus v. Sierra Club,* 442 U.S. 347, 355–65, 99 S.Ct. 2335, 2339–44, 60 L.Ed.2d 943 (1979) (analysis of the "careful distinction Congress has maintained between appropriation and legislation". *Id.* at 364, 99 S.Ct. at 2344, holding that appropriation requests do not constitute proposals for legislation); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189–93, 98 S.Ct. 2279, 2299–2301, 57 L.Ed.2d 117 (1978) (argument that subsequent appropriations measures which funded the construction of a facility in violation of the Endangered Species Act did not impliedly exempt that specific project from coverage of the Act; a contrary policy would violate express rules of both Houses of Congress providing that appropriation measures may not change existing substantive law).

From the foregoing it is clear that by appropriating funds for the EEOC, Congress has done nothing to directly enact legislation which would address the substantive issue of the EEOC's authority to institute litigation for enforcement of the Equal Pay Act.

## CONCLUSION

Although this decision will have far-reaching ramifications, it is one that is demanded under the clear terms of the decision of the Supreme Court in *Chadha.*

In light of the foregoing discussion of the technical legal principles, this court must conclude that the Reorganization Act of 1977 is unconstitutional. It necessarily follows that the Reorganizational Plan 1 of 1978, which contains the provision allowing the EEOC to enforce the Equal Pay Act, is unconstitutional since the Plan was adopted pursuant to the Act. Finally, it follows that the EEOC has no authority to act as Plaintiff in this cause and that Defendant's

motion for summary judgment must be sustained.