595 F.Supp. 568 (1984)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
STATE OF DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES, et al., Defendants.
Civ. A. No. 83-412-WKS.
United States District Court, D. Delaware.
September 24, 1984.
*569 Joseph J. Farnan, Jr., U.S. Atty., Wilmington, Del., David L. Slate, Gen. Counsel, Michael A. Middleton, Associate Gen. Counsel, Daniel M. Williams, Jr., Paul D. Brenner, Sr. Trial Attys., E.E.O.C., Washington, D.C., Spencer H. Lewis, Jr., Regional Atty., Issie L. Jenkins, Supervisory Trial Atty., Lanier E. Williams, Trial Atty., Carol Lunine, Trial Atty., E.E.O.C., Philadelphia, Pa., for plaintiff.
Regina M. Mullen, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants Dillman, Olsen and Golding.
Susan H. Kirk-Ryan, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant Dept. of Health and Social Services.

OPINION
STAPLETON, Chief Judge.
Plaintiff, the Equal Employment Opportunity Commission ("EEOC") brought this civil action to enforce the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206. EEOC alleges that defendant, Delaware Department of Health and Social Services ("DHSS"), is violating the EPA by paying lower wage rates to female employees than it pays to male employees performing substantially equal work. The EEOC seeks to enjoin defendant from further violating the Act and to recover back wages for employees affected by the defendant's past wage violations. EEOC asserts authority to enforce the provisions of the EPA pursuant to Sections 16(c) and 17 of the Fair Labor Standards Act, 29 U.S.C. §§ 216(c), 217, as amended by Section 1 of the Reorganization Plan No. 1 of 1978, 92 Stat. 3781.
The action is currently before the Court on defendant's motion to dismiss the complaint on the ground that the EEOC lacks proper authority to enforce the EPA. Defendant asserts that the EEOC was empowered to enforce the EPA by legislation that is unconstitutional because it contains a one House legislative veto provision.
The authority to enforce the EPA, and other equal employment opportunity legislation, was transferred from the Secretary of Labor to the EEOC by Reorganization Plan No. 1 of 1978. This Plan was created pursuant to the Reorganization Act of 1977, 5 U.S.C. § 901-12. The Reorganization Act authorized the President to make certain changes in the Executive Branch and its agencies. The Act, however, included a legislative veto provision that permitted either House, acting alone, to block any Executive reorganization proposal by passing a resolution of disapproval. 5 U.S.C. § 906.
Defendant's motion to dismiss is predicated on the landmark decision, INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), in which the Supreme Court declared unconstitutional the legislative veto provision of the Immigration and Naturalization Act, 8 U.S.C. § 1254(c)(2), which authorized either House of Congress to invalidate the Attorney General's decision to allow a particular deportable alien to remain in the United States. The Court held that the one House veto constituted legislative action that violated the express prescription for the enactment of laws contained *570 in Article I of the Constitution  passage by a majority of both Houses of Congress and presentment to the President. 103 S.Ct. at 2787.
Defendant argues that, unlike the situation in Chadha where the unconstitutional veto provision was found severable from the remainder of the Immigration Act, the presence of the legislative veto provision in the Reorganization Act renders the entire Reorganization Act unconstitutional, thereby invalidating the transfer of authority from the Secretary of Labor to the EEOC under the 1978 Plan. If defendant is correct, the complaint must be dismissed since the EEOC would not be properly authorized to enforce the EPA. The EEOC counters with two major arguments: first, EEOC concedes that the Reorganization Act's legislative veto provision, 5 U.S.C. § 906(a), is invalid under Chadha, but argues that it is severable, and that the remainder of the Act is a constitutional delegation of legislative power to the President; second, EEOC argues in the alternative that even if the entire Act must fall with its legislative veto provision Congress has ratified the Reorganization Plan No. 1 of 1978, and the transfer of EPA enforcement authority contained therein, by appropriation of funds.
To date, one circuit court and a number of district courts have addressed this precise issue.[1] The Fifth Circuit and a large majority of lower courts have held that the EEOC has valid enforcement authority.[2] However, at least four district courts have concluded that the EEOC is without authority to enforce the EPA or related equal employment opportunity legislation on the ground that the Reorganization Act is invalid by virtue of its legislative veto provision.[3]

I.
The Reorganization Act of 1977, unlike the statute at issue in Chadha, does not contain a severability provision. The presence of the severability clause in the Immigration and Naturalization Act at issue in Chadha gave rise to a strong presumption that its legislative veto provision was severable from the remainder of the statute. 103 S.Ct. at 2774. DDHS attempts to argue the converse, namely that the absence of a severability provision in the Reorganization Act entitles DDHS to the presumption that the Act's legislative veto provision is not severable. The Supreme Court, however, has stated, "But whatever relevance such an explicit clause might have in creating a presumption of severability, the ultimate determination of severability will rarely turn on the presence or absence of such a clause." United States v. Jackson, 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218 n. 27, 20 L.Ed.2d 138 (1968) (citation omitted). Rather, the question of severability is answered by inquiring whether Congress would have enacted the remainder of the statute without the *571 unconstitutional provision. Consumer Energy Council v. FERC, 673 F.2d 425, 442 (D.C.Cir.1982), aff'd without opinion, ___ U.S. ___, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). The Supreme Court has articulated a standard for determining whether a challenged provision is severable: "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." Buckley v. Valeo, 424 U.S. 1, 108-09, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (quoting Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)). In addition to acknowledging the presence of a severability clause, the Supreme Court in Chadha analyzed two factors to determine if the legislative veto provision was severable: first, the legislative history; and, second, if what remained after severance was "fully operative as a law." INS v. Chadha, 103 S.Ct. at 2274-75.
At the outset, it must be emphasized that the legislative history of the Reorganization Act of 1977 appears to contain only one explicit remark concerning the severability of the Act's legislative veto provision. In a separate opinion appended to the House Committee Report, Congressman Robert Drinan stated, "It must be remembered that H.R. 5045 intentionally does not contain a severability clause. The one House veto provision is deemed to be an integral and necessary part of the legislative scheme for reorganization. That is a proposition to which we all agree." H.R. Rep. No. 105, 95th Cong., 1st Sess. 42, reprinted in, 1977 U.S.Code Cong. & Ad. News 41, 69 (hereinafter H.R. No. 105, reprinted in 1977 USCCAN 41). With the exception of Representative Drinan's remark, however, there is no indication in the legislative history that Congress even considered the issue of severability. While Representative Drinan's statement is some evidence that Congress may not have intended the Act's legislative veto to be severable, I cannot conclude on the basis of one individual's remarks that it is "evident" that Congress would not have enacted the Reorganization Act of 1977 independently of its legislative veto provisions. Buckley v. Valeo, 424 U.S. at 108-9, 96 S.Ct. at 677-678. Recently, the Fifth Circuit also held that Congressman Drinan's statement was not sufficient to demonstrate that Congress considered the Reorganization Act's legislative veto indispensable to the remainder of the statute. EEOC v. Hernando Bank, Inc., 724 F.2d 1188, 1191 (5th Cir. 1984).
One of the central messages communicated by the Reorganization Act of 1977 and its legislative history was the pressing public need for governmental reorganization and the advantages, in terms of time and efficiency, to be gained from bypassing the ordinary legislative process. The Act itself declares that its purpose of government reorganization "may be accomplished in great measure by proceeding under this chapter, and can be accomplished more speedily thereby than by the enactment of specific legislation." 5 U.S.C. § 901(b). The House Committee Report also acknowledges the advantages of a procedure that permits reorganization outside of the time constraints imposed by ordinary legislation: "The Committee recognizes that a mechanism may be needed which is speedier than the normal legislative process, and has historically supported efforts by the President to make the Executive Branch more responsive to the needs of the American public." H.R. No. 105 at 4, reprinted in 1977 USCCAN at 44. The Senate Report advocated the need for a streamlined reorganization procedure more forcefully:
The present size and complexity of the Federal Government makes it imperative that in reorganizing the government Congress and the President be able to utilize the expedited procedures established in the Reorganization Act. There are too many agencies performing too many diverse tasks to make it practicable to reorganize each agency through separate legislation.
Sen.Rep. No. 32, 95th Cong., 1st Sess. 2 (1977). Similarly, the floor debate in both Houses emphasized the urgent need for *572 legislation that would empower the President to effect government reorganization.[4]
In addition to the above, a significant portion of the legislative history of the Act addresses the rather unique features of the Act's legislative veto. One of the major objectives of the sponsors of the Reorganization Act of 1977 was to develop a legislative veto procedure under which a vote by Congress would be assured on virtually every executive proposal. Such an opportunity for Congressional control of the reorganization process had not been available under previous reorganization procedures including those that had contained legislative vetos. H.R. No. 105 at 8, reprinted in 1977 USCCAN at 48. The legislative veto provision of the Act was specially designed so that both Houses of Congress were provided the opportunity to vote on a resolution of disapproval for every reorganization proposal submitted by the President, thereby "virtually guarantee[ing] a vote" by Congress in all cases. H.R. No. 105 at 9, reprinted in 1977 USCCAN at 48. In short, the legislative veto provision in question provided Congress with much greater control over the reorganization process than had theretofore been available.
Two closely related issues apparently motivated Congress to increase its participation in the reorganization process via a more exacting legislative veto procedure; first, many in Congress believed that the traditional legislative veto was unconstitutional; and, second, many in Congress desired to limit the President's authority in the reorganization arena. H.R. No. 105 at 9-18, reprinted in 1977 USCCAN at 49-57. Thus, by modifying the legislative veto in the Reorganization Act of 1977, Congress hoped to cure the veto of possible unconstitutionality and to limit the President's reorganization power. H.R. No. 105 at 3, 17, reprinted in 1977 USCCAN at 42-43, 57.
Not surprisingly, a number of statements in the House report and in debate applaud Congress's attempt to design a legislative veto that would pass constitutional muster and that would check Presidential control over the reorganization process.[5] Because these statements demonstrate that Congress intended to maintain substantial control over reorganization, defendant, DDHS, argues that Congress intended the legislative veto to be indispensable to the rest of the Act.
I do not disagree with defendant's argument that Congress intended to ensure its control over Presidential reorganization; Congressional control over executive action is inherent in any legislative veto. And, admittedly, Congress took special pains in this case to create a legislative veto that would increase its opportunity to carefully consider all executive reorganization proposals. But statements by members of Congress that the legislative veto of the *573 Reorganization Act was designed to ensure substantial control over changes in the executive branch of the government simply do not satisfy the Buckley v. Valeo standard; that is, these statements do not make it "evident" that Congress would not have enacted the Reorganization Act of 1977 independently of its legislative veto. This is particularly so when statements about the importance of the veto are measured against the legislative history's clear message that immediate government reorganization was necessary and should occur via a procedure less cumbersome than ordinary legislation.[6]
That Congress clearly felt the legislative veto of the Act to be important does not mean that Congress found the veto indispensable. The legislative history clearly reflects Congress's desire to effectuate government reorganization without resorting to ordinary legislation for each reorganization plan. On these facts, I conclude that it is not "evident that the legislature would not have enacted" the Reorganization Act without its legislative veto. Buckley v. Valeo, 424 U.S. at 108, 96 S.Ct. at 677. Because the Reorganization Act is also "fully operative as law" without its legislative veto provision, Chadha, 103 S.Ct. at 2772, I find that the veto provision is severable from the remainder of the Act.

II.
Even if the legislative veto of the Equal Pay Act is not severable, the EEOC contends that the Presidential transfer of functions challenged here has been subsequently ratified by Congressional actions that satisfy the constitutional requirements of bicameralism and presentment. I agree.
It is well settled that Congress may be subsequent enactment "give the force of law to official action unauthorized when taken." Swayne Hoyt v. United States, 300 U.S. 297, 302, 57 S.Ct. 478, 480, 81 L.Ed. 659 (1937). Congress may ratify unauthorized Presidential acts by appropriating funds to implement the executive action in question or by reference to the executive order in subsequent legislation. Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 147-48, 57 S.Ct. 407, 411-412, 81 L.Ed. 562 (1937). Isbrandtsen-Moller involved the legitimacy of an executive order abolishing the Shipping Board and transferring its function to the Secretary of Commerce. The Secretary of Commerce subsequently ordered the plaintiff shipping company to file certain documents with the Secretary. The shipping company argued that the Secretary's order was unauthorized because Congress did not intend that the President abolish the Shipping Board and transfer its functions to the Secretary of Commerce. Id. at 146-47, 57 S.Ct. at 411. The Supreme Court held that Congress ratified the President's action through subsequent appropriation acts that provided funds to the Department of Commerce to carry out the provisions of the Shipping Act and that made reference to the challenged executive order. Id. at 147, 57 S.Ct. at 411. In addition, the Supreme Court found further evidence of ratification in the Merchant Marine Act of 1936, which explicitly noted that the functions of the Shipping Board had passed to the Department of Commerce pursuant to the executive order in question. Id. at 147-48, 57 S.Ct. at 411-412.
Isbrandtsen-Moller is analogous to the case at bar. In 1982 and 1983, Congress passed appropriation acts that explicitly indicate that funds appropriated to the *574 EEOC are to be used, in part, to enforce the Equal Pay Act, 29 U.S.C. § 206(d). Act of November 28, 1983, Pub.L. No. 98-166, 97 Stat. 1071, 1088 (1983); Act of December 21, 1982, Pub.L. No. 97-377, 96 Stat. 1830, 1874 (1982). Notably, the 1983 appropriation act was passed after the Supreme Court's decision in Chadha declaring the one House legislative veto unconstitutional; in other words, in 1983, Congress ratified Reorganization Plan Number 1 through the ordinary legislative process aware of the Chadha decision and the possibility, therefore, that Reorganization Plan Number 1 was put into effect pursuant to an unconstitutional statute.
DHSS argues that Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), rather than Isbrandtsen-Moller, should determine the outcome of the present controversy. I disagree. In Greene v. McElroy, the Supreme Court declined to find congressional ratification of an allegedly unauthorized Department of Defense security clearance program merely on the ground that Congress had appropriated funds to finance one aspect of it. Central to the Supreme Court's decision in rejecting the ratification argument was the doubtful constitutionality of the security program itself  employees of private corporations performing work for the military could be denied security clearance by the government, and thereby lose their jobs, without the opportunity to confront and cross-examine their accusers. Id. at 493, 79 S.Ct. at 1411. Since the allegedly unauthorized security clearance program appeared to violate individual due process rights, the Supreme Court held that the program required authorization from an act of Congress more explicit than the mere appropriation of funds. Id. at 506-507, 79 S.Ct. at 1418-1419. The present case is readily distinguishable. Reorganization Plan Number 1 has not by its transference of duties from the Department of Labor to the EEOC established a program of questionable constitutionality "which is in conflict with our long accepted notions of fair procedures." Id. at 506-507, 79 S.Ct. at 1418-1419. Rather, the executive order challenged here, like the executive order at issue in Isbrandtsen-Moller, merely transferred certain duties from one executive agency to another, and does not involve the serious due process concerns of Greene v. McElroy.
DHSS also argues that more recent Supreme Court decisions, such as Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), refuse to accept congressional appropriations as proof of ratification. Tennessee Valley, however, is simply not a ratification case, and involves the very different question whether congressional appropriations to a federal project may impliedly repeal duly enacted legislation that bars completion of the project. Id. at 189-90, 98 S.Ct. at 2299-2300 (emphasis added). By pointing to later appropriations in this case, however, EEOC does not seek to overthrow any properly enacted prior legislation, but merely seeks to show that Congress subsequently ratified Reorganization Plan Number 1.
Accordingly, I will deny defendant DHSS's motion to dismiss this action.
NOTES
[1] Many of these cases concern the EEOC's authority to enforce the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. The Reorganization Plan No. 1 transferred to the EEOC authority to enforce the ADEA as well as the EPA. Since the Plan authorized the EPA to enforce both the EPA and the ADEA pursuant to the Reorganization Act, it is immaterial that these cases arise out of EEOC efforts to enforce the ADEA rather than the EPA.
[2] EEOC v. Hernando Bank, Inc., 724 F.2d 1188 (5th Cir.1984); e.g., EEOC v. Allegheny, No. 79-1531 (W.D.Pa. April 24, 1984); EEOC v. McCarthy, No. 76-2149-Z (D.Ma. April 18, 1984); EEOC v. Ingersoll Johnson Steel Co., 583 F.Supp. 983 (S.D.Ind.1984); EEOC v. U.S. Steel Corp., No. 10403 (W.D.Pa. April 5, 1984); Holecek v. Lincoln St. Louis, No. 83-0721 C (5) (E.D.Mo. March 27, 1984); EEOC v. Plessey, Inc., No. 78-1383 (D.Kan. March 9, 1984); EEOC v. Radio Montgomery, Inc., 588 F.Supp. 567 (W.D.Va. 1984); EEOC v. Memphis, 581 F.Supp. 179 (W.D. Tenn.1983); Mullen Optical Co. v. EEOC, 574 F.Supp. 946 (W.D.Tenn.1983).
[3] EEOC v. Allstate Insurance Co., 570 F.Supp. 1224 (S.D.Miss.1983), the leading case for the proposition that the EEOC lacks enforcement authority, would appear to have been silently overruled by the Fifth Circuit's decision, EEOC v. Hernando Bank, Inc., 724 F.2d 1188 (5th Cir. 1984); EEOC v. Martin Industries, Inc., 581 F.Supp. 1029 (N.D.Ala.1984); EEOC v. Chrysler Corp., No. 81-72347 (E.D.Mich. Jan. 23, 1984); EEOC v. Westinghouse Electric Corp., 33 FEP Cases 1232 (W.D.Pa.1984).
[4] Remarks of Sen. Percy, 123 Cong.Rec. 6145 (1977) ("I feel that there is an overwhelming desire in the country at large to make the Federal Government more efficient and more responsive to the real needs of all Americans."); Remarks of Sen. Muskie, 123 Cong.Rec. 6151 (1977) ("The need for these tools is all too obvious."); Remarks of Rep. Horton, 123 Cong.Rec. 9345 (1977) ("The American people are literally crying for effective reorganization of their government."); Remarks of Rep. Levitas, 123 Cong.Rec. 9348 (1977) ("There is a definite, a crying need for this legislation."); Remarks of Rep. Fountain, 123 Cong.Rec. 9345 (1977) ("If we ... requir[ed] that each plan be submitted in the traditional form of a legislative proposal, the President could too easily be blocked from accomplishing goals which are essential to more effective, efficient, economical and responsible operations of the executive agencies of Government.").
[5] Remarks of Rep. Horton, 123 Cong.Rec. 9345 (1977) ("I, of course, recognize the objection of some that it provides only for a very limited participation by the Congress, but my point is that it does provide for some degree of participation. For those of us who feel strongly that Congress should not forfeit its constitutional role on the question of reorganization, that is an important and meaningful provision."); Remarks of Rep. Boland, 123 Cong.Rec. 9352 (1977) ("This bill would give the President the authority to make government efficient  it will definitely not give him emperor-like power over all government."); Remarks of Rep. Levitas, 123 Cong.Rec. 9348 (1977) ("There will be substantial congressional control over reorganization. Not only will the President have to submit each plan to the Congress, and only three at one time can be pending, but either House of the Congress will be able to reject any plan that the President submits.").
[6] During debate a proposed amendment was introduced that would have required any court holding the legislative veto of the Act unconstitutional to invalidate only the plan before the court, rather than all plans adopted pursuant to the Act. Thus, representatives debating the amendment referred to it as a "doctrine of nonretroactivity" provision. Several lower courts have inferred from debate of the amendment that Congress must have assumed the inseverability of the legislative veto provision, for discussion of a nonretroactivity amendment would hardly be necessary if the Act's legislative veto was thought to be severable. E.g., EEOC v. Allstate Insurance Co., 570 F.Supp. 1224, 1231-1232 (S.D.Miss.1983). Again, I am constrained by the plain language of the Buckley standard. The evidence of inseverability must be "evident". The inference that may be drawn from the debate in question, neither alone, nor coupled with any other evidence already considered, meets the strict Buckley standard.