743 F.2d 380
 35 Fair Empl.Prac.Cas. 1147,
35 Empl. Prac. Dec. P 34,632,
5 Employee Benefits Ca 2098
MULLER OPTICAL COMPANY and Robert E. Long, Plaintiffs-Appellants,
v.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Defendant-Appellee.
 No. 83-5889.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 30, 1984.
Decided Sept. 4, 1984.
Rehearing and Rehearing En Banc Denied Nov. 5, 1984.
 
 1
 Stephen H. Biller (argued), Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, P.C., Stephen D. Wakefield, Memphis, Tenn., for plaintiffs-appellants.
 
 
 2
 Lawrence J. Kamenetsky, Zelma Phillips Brown, E.E.O.C., W. Hickman Ewing, U.S. Atty., Vivian Donelson, Memphis, Tenn., for defendant-appellee.
 
 
 3
 Herschel L. Abbott, Jr., H. Mark Adams, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., Rodger A. Kershner, Detroit, Mich., Joseph M. Wells, Marjorie Nemzura, Lombard, Ill., for amicus curiae, ANR Pipeline Company and Natural Gas Pipeline Company of America.
 
 
 4
 Before EDWARDS and WELLFORD, Circuit Judges, and JOINER, District Judge.*
 
 
 5
 JOINER, District Judge.
 
 
 6
 The issue in this appeal is whether the existence of an unexercised one-House legislative veto provision in the Reorganization Act of 1977 prevents the Equal Employment Opportunity Commission (EEOC) in 1982 from issuing and enforcing an administrative subpoena ordering the appellant to produce records in an age discrimination investigation, the enforcement authority under the Age Discrimination in Employment Act (ADEA) having been transferred from the Department of Labor to the EEOC in 1978 pursuant to the Reorganization Act.
 
 
 7
 For the reasons stated in this opinion, we hold that the transfer of enforcement authority from the Department of Labor to the EEOC was valid and the EEOC has the power to issue and enforce its administrative subpoena.
 
 
 8
 This action was brought by plaintiffs Muller Optical and its president, Robert E. Long, seeking a temporary restraining order or a preliminary injunction prohibiting the defendant, EEOC, from requiring Long to appear at a deposition and to produce certain documents pursuant to an administrative subpoena. The EEOC had issued the subpoena in connection with its attempts to investigate charges of age discrimination filed by an employee discharged by Muller Optical. Muller Optical had resisted all efforts by the EEOC to investigate the charge, making the subpoena necessary.
 
 
 9
 The plaintiffs argued that the EEOC lacked authority to investigate the age discrimination charges because the Reorganization Act of 1977, which authorized the transfer of authority to enforce the ADEA, was invalid because it contained a one-House legislative veto found unconstitutional by the Supreme Court in Immigration and Naturalization Service v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).
 
 
 10
 The District court denied the request for a preliminary injunction, holding that the offending provision was severable from the rest of the act and, in the alternative, that subsequent acts of Congress had ratified the transfer of enforcement authority under the ADEA from the Department of Labor to the EEOC. The case is now on appeal from that decision.
 
 
 11
 As a preliminary matter, the EEOC argues that Muller Optical lacks standing to bring this suit because it can demonstrate no injury. The claim is that Muller Optical suffers no more injury if it is investigated by the EEOC than it would if investigated by the Department of Labor. The district court rejected this argument as have other courts presented with this issue. Muller Optical Company v. EEOC, 574 F.Supp. 946 (W.D.Tenn.1983); EEOC v. Allstate Insurance Company, 570 F.Supp. 1224 (S.D.Miss.1983). See also, EEOC v. Chrysler Corp., No. 81-72347, slip op. at 8-10 (E.D.Mich. Jan. 23, 1984). In this case the plaintiffs have been subpoenaed by the EEOC and ordered to produce documents. The plaintiffs claim that the EEOC lacks authority to investigate the age discrimination claims and, therefore, lacks authority to issue the subpoena. The plaintiffs have alleged sufficient injury to meet the requirements for standing and the district court was correct in rejecting this frivolous argument. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102, 752, 758, 70 L.Ed.2d 700 (1982); Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).
 
 
 12
 The Court has entertained and granted motions on behalf of Chrysler Corporation and ANR Pipeline Company and Natural Gas Pipeline Company of America to file briefs amici curiae. The material provided by counsel has been of assistance to the Court in resolving this matter.
 
 LEGISLATIVE HISTORY
 Age Discrimination in Employment Act
 
 13
 Congress passed the Age Discrimination in Employment Act in 1967 and placed enforcement authority under the Department of Labor. The Secretary of Labor was given the authority to appoint agents and retain employees necessary to enforce the act, to issue necessary rules and regulations, to make investigations and to enforce the provisions of the act in accordance with the powers, remedies and procedures contained in designated sections of the Fair Labor Standards Act, 29 U.S.C. Secs. 625, 626, and 628.
 
 The Reorganization Act of 1977
 
 14
 In 1977 Congress passed the Reorganization Act, authorizing the President to reorganize the executive branch and its agencies to increase efficiency and to promote the better execution of the laws. 5 U.S.C. Sec. 901. Section 901 describes the broad policies of the Reorganization Act; sections 903 and 904 describe the methods by which the reorganization might be accomplished; and section 905 outlines the limitations on the reorganization power. The President was required to transmit each reorganization plan to both Houses of Congress, 5 U.S.C. Sec. 903, and the plan would become effective after the passage of 60 days. However, the statute permitted either House of Congress to prevent the plan from taking effect.
 
 
 15
 [A] reorganization plan is effective at the end of the first period of sixty calendar days of continuous session of Congress after the date on which the plan is transmitted to it unless, between the date of transmittal and the end of the sixty day period, either House passes a resolution stating in substance that the House does not favor the reorganization plan.
 
 
 16
 5 U.S.C. Sec. 906. The Reorganization Act also provided that a resolution disapproving each reorganization plan would be automatically introduced in the House of Representatives and in the Senate on the first day of session following transmittal of the plan. 5 U.S.C. Secs. 909-10. The plan would be reviewed by the Committee on Governmental Affairs of the Senate and by the Committee on Government Operations of the House and reported out of committee within 45 days. If the plan was not reported within 45 days, it would be placed on the calendar of the appropriate House for consideration. 5 U.S.C. Sec. 911.
 
 Reorganization Plan No. 1 of 1978
 
 17
 Reorganization Plan No. 1 of 1978 transferred the authority to enforce the ADEA to the EEOC. 43 F.R. 19807, 92 Stat. 3781, reprinted at 5 U.S.C.App. at 111 (Supp.1984).[1] The transfer of authority under the ADEA was complete and did not alter the substance of the enforcement authority in any way. The power of government over individuals and corporations was not enlarged nor was it diminished by the reorganization. The effect was merely to transfer the authority provided under the ADEA from the Labor Department to the EEOC.
 
 
 18
 Neither House of Congress exercised the legislative veto provision contained in Sec. 906 with respect to the Reorganization Plan No. 1 of 1978. The House rejected the resolution of disapproval by a vote of 356 to 39. See 124 Cong.Rec. 1136-37. The Senate Committee on Government Operations unfavorably reported a similar resolution of disapproval by a unanimous vote and, by unanimous consent, the Senate indefinitely postponed consideration of the resolution. See 124 Cong.Rec. 10,912, 12,888. The actions occurred after lengthy hearings by both committees assigned to review the Reorganization Plan of 1978.[2] The transfer of authority to enforce the ADEA was implemented on July 1, 1979, pursuant to the Reorganization Act and the Reorganization Plan No. 1 of 1978, and the EEOC has enforced the Act since that date. See Executive Order No. 12,144, 44 Fed.Reg. 37, 193 (June 26, 1979).
 
 Post Transfer Congressional Action
 
 19
 Since the transfer was effectuated, Congress has appropriated funds requested by the EEOC for the functions transferred. The appropriation bills for fiscal years 1981 and 1983 contain citations to both the Equal Pay Act and the Age Discrimination in Employment Act in connection with the appropriation made to the EEOC.[3] Hearings held in connection with budget submissions on behalf of the EEOC contain testimony referencing the enforcement of the Equal Pay Act and ADEA as an EEOC function.[4]
 
 
 20
 The Civil Service Reform Act of 1978 contains a specific reference to Reorganization Plans 1 and 2 of 1978, stating that any provision of either plan which was inconsistent with the Act was superceded. 5 U.S.C. Sec. 1101 note at 93 (Supp.1984). Nothing in the Civil Service Reform Act of 1978 was inconsistent with the transfer of ADEA enforcement authority contained in Reorganization Plan No. 1 of 1978.THE CHADHA DECISION
 
 
 21
 In Immigration and Naturalization Service v. Chadha, supra, the Supreme Court held that the exercise of a one-House veto, authorized by statute, was unconstitutional because it enabled Congress to act in a legislative capacity without complying with the procedural requirements of Article I. Chadha addressed the one-House veto provision contained in Sec. 244(c)(2) of the Immigration and Nationality Act, 8 U.S.C. Sec. 1254(c)(2), which had been exercised to reverse a decision by the Attorney General granting permanent residence to six aliens, including Chadha. Section 244(c)(1) of the Act gave the Attorney General discretionary power to suspend the deportation of an alien under certain conditions. Upon exercising this power, the Attorney General was required to prepare a detailed report for submission to Congress, which would enable it to review the decision. Under Sec. 244(c)(2) either House could pass a resolution reversing the decision of the Attorney General and the House of Representatives passed such a resolution. The Supreme Court found that Congress had delegated the authority to the Attorney General and could not alter the decision to suspend deportation, if at all, except through the established legislative process of Article I of the Constitution. The exercise of the one-House veto in Chadha was a legislative act which altered rights, duties and relations and, as such, was an exercise of power unauthorized by the Constitution.
 
 
 22
 Examination of the action taken here by one House pursuant to Sec. 244(c)(2) reveals that it was essentially legislative in purpose and effect. In purporting to exercise power defined in Art. 1, Sec. 8, cl. 4 to "establish an uniform Rule of Naturalization," the House took action that had the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, executive branch officials and Chadha, all outside the legislative branch. Section 244(c)(2) purports to authorize one House of Congress to require the Attorney General to deport an individual alien whose deportation otherwise would be cancelled under Sec. 244. The one-House veto operated in this case to overrule the Attorney General and mandate Chadha's deportation; absent the House action, Chadha would remain in the United States. Congress has acted and its action has altered Chadha's status.
 
 
 23
 The legislative character of the one-House veto in this case is confirmed by the character of the Congressional action it supplants. Neither the House of Representatives nor the Senate contends that, absent the veto provision in Sec. 244(c)(2), either of them, or both of them acting together, could effectively require the Attorney General to deport an alien once the Attorney General, in the exercise of legislatively delegated authority, had determined the alien should remain in the United States. Without the challenged provision in Sec. 244(c)(2), this could have been achieved, if at all, only by legislation requiring deportation.
 
 
 24
 Chadha, supra, 103 S.Ct. at 2784-85. It is clear from the decision in Chadha that the exercise of a one-House veto is unconstitutional. It is not altogether clear, however, how this decision affects statutes containing one-House veto provisions that Congress has chosen not to exercise. That is precisely the problem presented in this case and the problem that looms over a significant number of statutes passed by Congress.
 
 
 25
 If Chadha applies to potentially invalidate all statutes containing legislative veto provisions, whether exercised or not, a substantial amount of legislation will be drawn into question as well as agency action thereunder. See Chadha, supra, 103 S.Ct. at 2811-16 (Appendix to dissenting opinion of J. White). Justice White, in his dissenting opinion in Chadha, states that legislative veto provisions have been included in nearly 200 statutes covering a variety of areas. The Reorganization Act of 1977 alone, which is the subject of this case, was the basis for ten different reorganization plans which became effective between 1977 and 1980. See 5 U.S.C.App. I at 98-152 (Supp.1984). The various plans created offices and agencies, transferred functions among agencies, and consolidated functions to eliminate duplication--all as directed by Congress in the Reorganization Act. The present case is merely one of the many possible ways a dispute might arise challenging a specific act of reorganization.
 
 
 26
 As easily predicted, there have been a number of cases since Chadha challenging statutes containing legislative veto provisions and courts have used a variety of approaches in dealing with the problem.[5] All of the arguments and approaches to the problem used in these cases have been thoroughly explored by the interested parties in this case.
 
 ANALYSIS
 
 27
 The EEOC argues that the court should not apply Chadha for two reasons:
 
 
 28
 1. The unconstitutional one-House veto provision can be severed to preserve the substantive portions of the Reorganization Act and thereby to validate the Reorganization Plans implemented pursuant to the Act. In Chadha, supra, the Supreme Court found that the one-House veto provision of the Immigration and Nationality Act was severable from the remaining provisions based upon the presence of a severability clause and the legislative history of the Act. The Reorganization Act contains no severability clause but the EEOC argues that severability can be drawn from the legislative history.
 
 
 29
 2. Congressional action subsequent to the Reorganization Act has impliedly ratified the transfer of ADEA enforcement authority to the EEOC. The Commission contends that the subsequent appropriations to the EEOC, which cite enforcement of the Equal Pay Act and the ADEA as part of the basis for the appropriation, and the reference to the Reorganization Plan No. 1 of 1978 in the Civil Service Reform Act support a finding of ratification.
 
 
 30
 An amicus asserts that the transfer of enforcement authority to the EEOC was not consistent with Congressional intent demonstrated in the legislative history surrounding the provision of the Age Discrimination in Employment Act which vested enforcement authority in the Department of Labor. That amicus argues that Congress carefully considered the placement of enforcement authority and specifically chose the Department of Labor instead of the newer and more inexperienced EEOC and that the transfer directly contravenes the original action of Congress.
 
 
 31
 All of these arguments assume that the presence of the one-House veto in the Reorganization Act is alone sufficient to invalidate the Act, without regard to the fact that the veto was not exercised in this case. The Court is not persuaded that Chadha dictates this conclusion or necessitates framing the issues in this way.
 
 
 32
 The basis for the decision in Chadha is the doctrine of separation of powers which is integral to the constitutional scheme. Under Art. I, Sec. 1, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." Article II, Section 1 provides "The executive Power shall be vested in a President of the United States of America". And Article III, Section 1 vests in the "Supreme Court, and in such inferior Courts as Congress may from time to time ordain and establish" the "judicial power of the United States".
 
 
 33
 The President may not circumvent the constitution by attempting to legislate by Executive Order. Youngstown Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Congress may not usurp the appointment power vested in the President pursuant to Art. II, Sec. 2, cl. 2 Buckley v. Valeo, 424 U.S. 1, 120-43, 96 S.Ct. 612, 682-94, 46 L.Ed.2d 659 (1976). Congress may not exercise judicial power by legislating deprivations for specific individuals or groups of individuals in violation of the Bill of Attainder Clause. United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). The constitution dictates each of these results through the specific delegations of power in Articles I, II, and III.
 
 
 34
 The Supreme Court in Chadha found that the exercise of one-House veto violated the constitution because in substance it was an attempt to legislate by one-House of Congress. In using the veto, the House of Representatives purported to exercise more power than it had been given by the constitution. For a particular bill to become law, it must be passed by both Houses of Congress and presented to the President and neither requirement was met. The exercise of the veto in Chadha also invaded the authority of the Executive Branch in that it sought to require the Attorney General to deport an alien after he had decided, in the exercise of properly delegated authority, that the alien should be permitted to stay.
 
 
 35
 The judiciary, like the other two branches of government, is confined to the power granted by the constitution and can act only within the context of a case or controversy brought in conformity with the jurisdictional grant of Article III, Sec. 2. The policy of judicial restraint is consistent with the separation of powers inherent in the constitutional scheme and the idea that courts should be reluctant to act absent a specific case brought within the constitutional grant of jurisdiction was articulated long ago in Hayburn's Case, 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792) and in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). The duty to avoid decisions of constitutional questions and the various doctrines related to advisory opinions, political questions, ripeness, etc., are all based upon the general policy of judicial restraint. Consequently, this court must seek to avoid the constitutional determination and must attempt to preserve the legislation in question, if possible. See, e.g., Johnson v. Robison, 415 U.S. 361, 366-67, 94 S.Ct. 1160, 1165-66, 39 L.Ed.2d 389 (1974); United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 rehearing denied, 403 U.S. 924, 91 S.Ct. 2221, 29 L.Ed.2d 702 (1971); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932); Trade-Mark Cases, 100 U.S. 82, 96, (10 Otto) 82, 96, 25 L.Ed. 550 (1879).
 
 
 36
 It is with these principles in mind that the court approaches the question of the constitutionality of the Reorganization Act and the Reorganization Plan No. 1 of 1978. It is clear that Chadha dictates and expressly holds that the exercise of the one-House veto is unconstitutional. In exercising the veto Congress purported to act in a legislative capacity. This action was a violation of Article I. In the present case, Congress did not exercise the veto and did not act to legislate contrary to its constitutional grant of power.
 
 
 37
 The Reorganization Act expressly delegated the power to the President to reorganize and restructure the executive branch consistent with the policies and the limitations of the Act. 5 U.S.C. Secs. 901-912. The President prepared the Reorganization Plan No. 1 of 1978 in conformity with the power delegated. The plan did not alter the substance of any right conferred under the Age Discrimination in Employment Act but merely transferred the authority to enforce substantive rights to the EEOC.[6] It is clear from the legislative history that Congress was satisfied that the President had complied with the standards set forth in the Act. As discussed earlier, the House voted against the resolution of disapproval and the Senate unanimously consented to table the resolution after receiving the recommendation from its Committee on Government Operations that the resolution of disapproval be rejected. Both the House and Senate committees charged with reviewing the reorganization plan conducted hearings on the advisability of the transfer of enforcement authority prior to presenting recommendations on the resolutions.[7]
 
 
 38
 In enacting the Reorganization Act, Congress tried, through the legislative veto, to put a string on the power delegated to the President in much the same way as it tried to put a string on the power delegated to the Attorney General in Chadha. As in Chadha, the veto provision could not be validly exercised. However, in the present case, the one-House veto was never exercised and the legislative history surrounding the Reorganization Plan No. 1 of 1978 demonstrates that the President acted in accordance with the wishes of Congress. The Reorganization Act itself was enacted in conformance with Article I and Congress did not veto the plan and then did not act in an unconstitutional manner in violation of Article I as occurred in Chadha. The legislative and executive branches of government never came into conflict as they did in Chadha to create a constitutional confrontation that would require judicial intervention. When there is no confrontation, the court should not create one and should not decide questions in the hypothetical.
 
 
 39
 Therefore, the court concludes that it is not necessary to examine the legislative history to determine whether the veto provision is severable. Nor is it necessary to determine if subsequent actions of Congress constitute a ratification of the President's reorganization plan. These issues are simply not relevant in this case. When the President Acts in accordance with the wishes of Congress and Congress does not act in an unconstitutional manner by attempting to legislate by means of the one-House veto, there is no need to go further and examine the severability question as was necessary in Chadha. If Congress had attempted to legislate in this unconstitutional manner, then the issue would be relevant. But when Congress does not act unconstitutionally, the severability of a provision permitting unconstitutional action should not be part of the proper analysis of the problem.
 
 
 40
 The central question for the consideration of severability is whether Congress would have passed the statute absent the offending provision. The difficulty arises when an invalid provision is an integral part of the scheme contemplated by the statute. It is hard to see the logic of this inquiry under the circumstances of the present case. Congress has long since reviewed the President's reorganization plan and has long since chosen not to exercise the one-House veto. Congress and the President were apparently in accord with respect to the transfer of authority to the EEOC. To inquire at this point in time whether Congress would have passed the Reorganizational Act without the one-House veto provision and, thereby, whether the substantive provisions of the Act are effective absent the provision, makes no sense when Congress has already declined to use the veto provision and thus has already approved the plan. Such an inquiry would involve the court in needless speculation and would require it to manufacture a conflict between Congress and the President when no conflict in fact exists.
 
 
 41
 Not only is a consideration of the severability of the veto provision not relevant for all the reasons stated, but also severance in the absence of a clearly expressed legislative intent is a murky endeavor and the resting of a constitutional decision involving the transfer of executive power on such an exercise filled with the subjective feelings so necessary to this type of analysis should be avoided. Instead, a court faced with the claim made in this case should endeavor to provide analysis and guidance that does not involve the subjective opinions of individuals and that will help solve the constitutional claims in the hundreds of other cases arising as a result of more than half a century of inclusion of a legislative veto provision in statutes. The correct analysis is that Congress did not act unconstitutionally when it passed the Reorganization Act of 1977. Congress did not act unconstitutionally by attempting to exercise a one-House veto. No conflict existed between Congress and the executive. The existence of an unused portion of the statute which, if used, would not be valid does not make invalid the exercise of power directed by the statute.
 
 
 42
 The conclusion, that the existence of a one-House veto provision in a statute does not render the statute invalid but only renders the act of Congress, if it attempts to exercise its one-House veto invalid, does not end the court's inquiry in this case.
 
 
 43
 Congress may not delegate legislative authority without establishing a set of standards to guide, direct and circumscribe the exercise of that authority. Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).
 
 
 44
 It is thought by some that the legislative veto has been used by Congress to avoid the difficult problem of designing standards sufficiently detailed to provide guidance, See Chadha, supra, 103 S.Ct. at 2792-96 (J. White dissenting). As Professor Tribe said prior to Chadha, the inclusion of a legislative veto should not cure an overbroad delegation of authority. L. Tribe, American Constitutional Law, 162 (1978). On the other hand, he likewise observed that a properly limited delegation is not rendered overbroad by the inclusion of a legislative veto. Id.
 
 
 45
 The real issue facing this court in this case, and in all cases involving statutes in which the legislative veto has not been exercised, is whether the delegation of authority is accompanied by sufficient standards to permit the executive to constitutionally exercise the power given.
 
 
 46
 The legislative history of the Reorganization Act demonstrates than Congress was mindful of the possible constitutional problems with the one-house veto and included standards in the statute to increase Congressional control over the reorganization process and to increase the likelihood that the statute would be found constitutional.[8]
 
 
 47
 The standards provided are of varying kinds and, taken as a whole, guide, direct and circumscribe the President in reorganizing the executive branch.
 
 
 48
 First, Congress directed that the reorganization plans should be designed to further one or more of the following purposes:
 
 
 49
 Promote better execution of the laws;
 
 
 50
 Promote more effective management of the executive branch and its agencies;
 
 
 51
 Promote the effective administration of the public business;
 
 
 52
 Reduce expenditures;
 
 
 53
 Promote economy;
 
 
 54
 Increase efficiency;
 
 
 55
 Coordinate and consolidate agencies and functions according to major purposes;
 
 
 56
 Reduce the number of agencies by consolidating those with similar functions and abolish such agencies or functions thereof as may not be necessary to efficient government;
 
 
 57
 Eliminate overlapping and duplicating effort.
 
 
 58
 5 U.S.C. Sec. 901. These are explicit guides and directives to the President which provide a careful framework for the authority granted. Furthermore, these are not the only standards provided in the statute.
 
 
 59
 The Act is specific in excluding certain activity of the executive department from its operation. 5 U.S.C. Sec. 902 (excluding the General Accounting Office and the Comptroller General). The President is also prohibited from "creating a new executive department, abolishing or transferring an executive department of independent regulatory agency, or all the functions thereof, or consolidating two or more executive departments or two or more independent regulatory agencies, or all of the functions thereof." 5 U.S.C. Sec. 905(a)(1). He is proscribed from extending the life of an agency and from authorizing an agency to exercise a function which is not expressly authorized by law at the time of the plan. 5 U.S.C. Sec. 905(a)(2)-(4).
 
 
 60
 The statute provides both general and specific directives for the exercise of the reorganization power as well as a number of circumscribing limitations upon the exercise of that power. The transfer of ADEA enforcement functions from the Department of Labor to EEOC is not unconstitutional under these circumstances. We agree with the analysis of the court in E.E.O.C. v. Hernando Bank, Inc., 724 F.2d 1188 (5th Cir.1984) in this regard:
 
 
 61
 The substantive limitations imposed retain for Congress control over the substantive operations of the federal government. The Act does nothing more than delegate to the President the authority to reorganize the complex bureaucratic machinery of the executive branch so as to implement most effectively Congress' substantive policies.
 
 
 62
 724 F.2d at 1192.
 
 
 63
 It is clear that "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." Schechter Corp. v. United States, supra, 295 U.S. at 529, 55 S.Ct. at 843 (quoted with approval in National Cable Television Ass'n. v. United States, 415 U.S. 336, 342, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974)).[9] This does not mean, however, that Congress may never delegate authority.
 
 
 64
 "If Congress shall lay down by legislative act an intelligible principle ... such legislative action is not a forbidden delegation of legislative power." Hampton Co. v. United States, 276 U.S. 394, 409 [48 S.Ct. 348, 352, 72 L.Ed. 624]. Standards prescribed by Congress are to be read in light of the conditions to which they are to be applied. "They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear." American Power & Light Co. v. S.E.C., 329 U.S. 90, 104 [67 S.Ct. 133, 142, 91 L.Ed. 103].
 
 
 65
 Lichter v. United States, supra, 334 U.S. at 785, 68 S.Ct. at 1316.
 
 
 66
 In Lichter the Supreme Court upheld a delegation of authority to renegotiate all contracts and subcontracts made by the War Department, the Navy Department or the Maritime Department. The Secretary of each department was instructed to require the contractor or subcontractor to renegotiate a contract whenever the Secretary determined that "excessive profits" had been realized or were likely to be realized. The Renegotiation Act did not define the term "excessive profits". The Court, however, found that the term itself was sufficiently clear in light of the factual background of the Act. Furthermore, the power authorized under the Act was for a limited period of time.
 
 
 67
 The standards provided in the Reorganization Act of 1977 are considerably more detailed than those in the Renegotiation Act found valid in Lichter. The authority to reorganize the executive branch was also conferred for a limited period of time.[10]
 
 
 68
 Finally, the extent and the type of authority delegated in the Reorganization Act is an important consideration. The cases discussing the sufficiency of the standards needed to sustain a delegation of power use the phrase "in light of the conditions to which they are to be applied." Lichter, supra, 334 U.S. at 785, 68 S.Ct. at 1316. In 1978 Congress recognized that the government had grown over a number of decades by adding one agency on top of another, often with conflicting or duplicative authority. H.R.Rep. No. 95-105, supra at 4, 1977 U.S.Code Cong. & Ad.News at 43-44. Congress also recognized that reorganization could be accomplished more speedily by the President "than by the enactment of specific legislation." 5 U.S.C. Sec. 901(b). The President was given authority to streamline the executive branch as a manager would streamline a department of a company. He was not given authority to eliminate functions, to alter substantive rights, or to change the way in which statutes could be enforced. The standards provided in the Act are clearly sufficient, in light of the conditions to which they were to be applied and in light of the nature of the authority delegated.[11] We do not construe the action by the Congress in this case to be an evasion of the Constitution by enactment of executive proposals by mere silence, See Chadha, 462 U.S. at ---- n. 22, 103 S.Ct. at 2787 n. 22, nor did the Congressional action in reorganization alter the substantive rights of parties subject to ADEA as was the case in Chadha where the substantive rights of the alien and I.N.S. were affected by one-House action, id. at ----, 103 S.Ct. at 2784.
 
 
 69
 While the court has discussed the facts relative to the ratification argument set forth by the EEOC, we do not mean to imply that ratification is a proper ground for upholding the Reorganization Plan No. 1 of 1978. The facts do not support ratification, and we do not adopt EEOC's argument in this respect. However, the facts are relevant to the broader issue of whether the plan was, in fact, consistent with the standards articulated in the Reorganization Act, and to the lack of constitutional confrontation between the executive and legislative branches, and to the complete legislative history of this particular transfer of authority and have therefore been included.
 
 
 70
 For the reasons given above, the order of the district court denying the motion for a preliminary injunction is AFFIRMED.
 
 APPENDIX I
 REORGANIZATION PLAN NO. 1 OF 1978
 43 F.R. 19807, 92 Stat. 3781
 
 71
 Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, February 23, 1978, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code.
 
 EQUAL EMPLOYMENT OPPORTUNITY
 
 72
 Section 1. Transfer of Equal Pay Enforcement Functions
 
 
 73
 All functions related to enforcing or administering Section 6(d) of the Fair Labor Standards Act, as amended, (29 U.S.C. 206(d)) [section 206(d) of Title 29, Labor] are hereby transferred to the Equal Employment Opportunity Commission. Such functions include, but shall not be limited to, the functions relating to equal pay administration and enforcement now vested in the Secretary of Labor, the Administrator of the Wage and Hour Division of the Department of Labor, and the Civil Service Commission pursuant to Sections 4(d)(1); 4(f); 9; 11(a), (b), and (c); 16(b) and (c) and 17 of the Fair Labor Standards Act, as amended, (29 U.S.C. 204(d)(1); 204(f); 209, 211(a), (b), and (c), 216(b) and (c) and 217 [sections 204(d)(1), 204(f), 209, 211(a), (b), and (c), 216(b) and (c), and 217 of Title 29, Labor] and Section 10(b)(1) of the Portal-to-Portal Act of 1947, as amended, (29 U.S.C. 259) [section 259(b)(1) of Title 29, Labor].
 
 
 74
 Section 2. Transfer of Age Discrimination Enforcement Functions
 
 
 75
 All functions vested in the Secretary of Labor or in the Civil Service Commission pursuant to Sections 2, 4, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of the Age Discrimination in Employment Act of 1967, as amended; (29 U.S.C. 621, 623, 626, 627, 628, 629, 630, 631, 632, 633, and 633a) [sections 621, 623, 626, 627, 628, 629, 630, 631, 632, 633, and 633a of Title 29, Labor] are hereby transferred to the Equal Employment Opportunity Commission. All functions related to age discrimination administration and enforcement pursuant to Sections 6 and 16 of the Age Discrimination in Employment Act of 1967, as amended, (29 U.S.C. 625 and 634) [sections 625 and 634 of Title 29, Labor] are hereby transferred to the Equal Employment Opportunity Commission.
 
 
 76
 Section 3. Transfer of Equal Opportunity in Federal Employment Enforcement Functions
 
 
 77
 (a) All equal opportunity in Federal employment enforcement and related functions vested in the Civil Service Commission pursuant to Section 717(b) and (c) of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e-16(b) and (c)) [section 2000e-16(b) and (c) of Title 42, The Public Health and Welfare], are hereby transferred to the Equal Employment Opportunity Commission.
 
 
 78
 (b) The Equal Employment Opportunity Commission may delegate to the Civil Service Commission or its successor the function of making a preliminary determination on the issue of discrimination whenever, as a part of a complaint or appeal before the Civil Service Commission on other grounds, a Federal employee alleges a violation of Section 717 of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e-16) [section 2000e-16 of Title 42, The Public Health and Welfare] provided that the Equal Employment Opportunity Commission retains the function of making the final determination concerning such issue of discrimination.
 
 
 79
 Section 4. Transfer of Federal Employment of Handicapped Individuals Enforcement Functions
 
 
 80
 All Federal employment of handicapped individuals enforcement functions and related functions vested in the Civil Service Commission pursuant to Section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791) [section 791 of Title 29, Labor] are hereby transferred to the Equal Employment Opportunity Commission. The function of being co-chairman of the Interagency Committee on Handicapped Employees now vested in the Chairman of the Civil Service Commission pursuant to Section 501 is hereby transferred to the Chairman of the Equal Employment Opportunity Commission.
 
 
 81
 Section 5. Transfer of Public Sector 707 Functions
 
 
 82
 Any function of the Equal Employment Opportunity Commission concerning initiation of litigation with respect to State or local government, or political subdivisions under Section 707 of Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e-6) [section 2000e-6 of Title 42, The Public Health and Welfare] and all necessary functions related thereto, including investigation, findings, notice and an opportunity to resolve the matter without contested litigation, are hereby transferred to the Attorney General, to be exercised by him in accordance with procedures consistent with said Title VII [section 2000e et seq. of Title 42, The Public Health and Welfare]. The Attorney General is authorized to delegate any function under Section 707 of said Title VII [section 2000e-6 of Title 42, The Public Health and Welfare] to any officer or employee of the Department of Justice.
 
 
 83
 Section 6. Transfer of Functions and Abolition of the Equal Employment Opportunity Coordinating Council
 
 
 84
 All functions of the Equal Employment Opportunity Coordinating Council, which was established pursuant to Section 715 of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e-14) [section 2000e-14 of Title 42, The Public Health and Welfare], are hereby transferred to the Equal Employment Opportunity Commission. The Equal Employment Opportunity Coordinating Council is hereby abolished.
 
 Section 7. Savings Provision
 
 85
 Administrative proceedings including administrative appeals from the acts of an executive agency (as defined by Section 105 of Title 5 of the United States Code) [section 105 of Title 5, Government Organization and Employees] commenced or being conducted by or against such executive agency will not abate by reason of the taking effect of this Plan. Consistent with the provision of this Plan, all such proceedings shall continue before the Equal Employment Opportunity Commission otherwise unaffected by the transfers provided by this Plan. Consistent with the provisions of this Plan, the Equal Employment Opportunity Commission shall accept appeals from those executive agency actions which occurred prior to the effective date of this Plan in accordance with law and regulations in effect on such effective date. Nothing herein shall affect any right of any person to judicial review under applicable law.
 
 Section 8. Incidental Transfers
 
 86
 So much of the personnel, property, records and unexpended balances of appropriations, allocations and other funds employed, used, held, available, or to be made available in connection with the functions transferred under this Plan, as the Director of the Office of Management and Budget shall provide, except that no such unexpended balances transferred shall be used for purposes other than those for which the appropriation was originally made. The Director of the Office of Management and Budget shall provide for terminating the affairs of the Council abolished herein and for such further measures and dispositions as such Director deems necessary to effectuate the purposes of this Reorganization Plan.
 
 Section 9. Effective Date
 
 87
 This Reorganization Plan shall become effective at such time or times, on or before October 1, 1979, as the President shall specify, but not sooner than the earliest time allowable under Section 906 of Title 5 of the United States Code [section 906 of Title 5, Governmental Organization and Employees].
 
 
 88
 [Pursuant to Ex.Ord. No. 12144, June 22, 1979, 44 F.R. 37193, sections 1 and 2 of this Reorg. Plan are effective July 1, 1979, except for transfer of functions already effective Jan. 1, 1979, under Ex.Ord. No. 12106 above.]
 
 
 89
 [Pursuant to Ex.Ord. No. 12068, June 30, 1978, 43 F.R. 28971, section 5 of this Reorg.Plan is effective July 1, 1978.]
 
 APPENDIX II
 MESSAGE OF THE PRESIDENT
 To the Congress of the United States:
 
 90
 I am submitting to you today Reorganization Plan No. 1 of 1978. This Plan makes the Equal Employment Opportunity Commission the principal Federal agency in fair employment enforcement. Together with actions I shall take by Executive Order, it consolidates Federal equal employment opportunity activities and lays, for the first time, the foundation of a unified, coherent Federal structure to combat job discrimination in all its forms.
 
 
 91
 In 1940 President Roosevelt issued the first Executive Order forbidding discrimination in employment by the Federal government. Since that time the Congress, the courts and the Executive Branch--spurred by the courage and sacrifice of many people and organizations--have taken historic steps to extend equal employment opportunity protection throughout the private as well as public sector. But each new prohibition against discrimination unfortunately has brought with it a further dispersal of Federal equal employment opportunity responsibility. This fragmentation of authority among a number of Federal agencies has meant confusion and ineffective enforcement for employees, regulatory duplication and needless expense for employers.
 
 
 92
 Fair employment is too vital for haphazard enforcement. My Administration will aggressively enforce our civil rights laws. Although discrimination in any area has severe consequences, limiting economic opportunity affects access to education, housing and health care. I, therefore, ask you to join with me to reorganize administration of the civil rights laws and to begin that effort by reorganizing the enforcement of those laws which ensure an equal opportunity to a job.
 
 
 93
 Eighteen government units now exercise important responsibilities under statutes, Executive Orders and regulations relating to equal employment opportunity:
 
 
 94
 The Equal Employment Opportunity Commission (EEOC) enforces Title VII of the Civil Rights Act of 1964 [section 2000e et seq. of Title 42, The Public Health and Welfare], which bans employment discrimination based on race, national origin, sex or religion. The EEOC acts on individual complaints and also initiates private sector cases involving a "pattern or practice" of discrimination.
 
 
 95
 The Department of Labor and 11 other agencies enforce Executive Order 11246 [set out as a note under section 2000e of Title 42]. This prohibits discrimination in employment on the basis of race, national origin, sex, or religion and requires affirmative action by government contractors. While the Department now coordinates enforcement of this "contract compliance" program, it is actually administered by eleven other departments and agencies. The Department also administers those statutes requiring contractors to take affirmative action to employ handicapped people, disabled veterans and Vietnam veterans.
 
 
 96
 In addition, the Labor Department enforces the Equal Pay Act of 1963 [section 206(d) of Title 29, Labor], which prohibits employers from paying unequal wages based on sex, and the Age Discrimination in Employment Act of 1967 [section 621 et seq. of Title 29], which forbids age discrimination against persons between the ages of 40 and 65.
 
 
 97
 The Department of Justice litigates Title VII cases involving public sector employers--State and local governments. The Department also represents the Federal government in lawsuits against Federal contractors and grant recipients who are in violation of Federal nondiscrimination prohibitions.
 
 
 98
 The Civil Service Commission (CSC) enforces Title VII and all other nondiscrimination and affirmative action requirements for Federal employment. The CSC rules on complaints filed by individuals and monitors affirmative action plans submitted annually by other Federal agencies.
 
 
 99
 The Equal Employment Opportunity Coordinating Council includes representatives from EEOC, Labor, Justice, CSC and the Civil Rights Commission. It is charged with coordinating the Federal equal employment opportunity enforcement effort and with eliminating overlap and inconsistent standards.
 
 
 100
 In addition to these major government units, other agencies enforce various equal employment opportunity requirements which apply to specific grant programs. The Department of Treasury, for example, administers the anti-discrimination prohibitions applicable to recipients of revenue sharing funds.
 
 
 101
 These programs have had only limited success. Some of the past deficiencies include:
 
 
 102
 --inconsistent standards of compliance;
 
 
 103
 --duplicative, inconsistent paperwork requirements and investigative efforts;
 
 
 104
 --conflicts within agencies between their program responsibilities and their responsibility to enforce the civil rights laws;
 
 
 105
 --confusion on the part of workers about how and where to seek redress;
 
 
 106
 --lack of accountability.
 
 
 107
 I am proposing today a series of steps to bring coherence to the equal employment enforcement effort. These steps, to be accomplished by the Reorganization Plan and Executive Orders, constitute an important step toward consolidation of equal employment opportunity enforcement. They will be implemented over the next two years, so that the agencies involved may continue their internal reform.
 
 
 108
 Its experience and broad scope make the EEOC suitable for the role of principal Federal agency in fair employment enforcement. Located in the Executive Branch and responsible to the President, the EEOC has developed considerable expertise in the field of employment discrimination since Congress created it by the Civil Rights Act of 1964 [section 2000e-4 of Title 42]. The Commission has played a pioneer role in defining both employment discrimination and its appropriate remedies.
 
 
 109
 While it has had management problems in past administrations, the EEOC's new leadership is making substantial progress in correcting them. In the last seven months the Commission has redesigned its internal structures and adopted proven management techniques. Early experience with these procedures indicates a high degree of success in reducing and expediting new cases. At my direction, the Office of Management and Budget is actively assisting the EEOC to ensure that these reforms continue.
 
 
 110
 The Reorganization Plan I am submitting will accomplish the following:
 
 
 111
 On July 1, 1978, abolish the Equal Employment Opportunity Coordinating Council (42 U.S.C. 2000e-14) and transfer its duties to the EEOC (no positions or funds shifted).
 
 
 112
 On October 1, 1978, shift enforcement of equal employment opportunity for Federal employees from the CSC to the EEOC (100 positions and $6.5 million shifted.)
 
 
 113
 On July 1, 1979, shift responsibility for enforcing both the Equal Pay Act and the Age Discrimination in Employment Act from the Labor Department to the EEOC (198 positions and $5.3 million shifted for Equal Pay; 119 positions and $3.5 million for Age Discrimination).
 
 
 114
 Clarify the Attorney General's authority to initiate "pattern or practice" suits under Title VII in the public sector.
 
 
 115
 In addition, I will issue an Executive Order on October 1, 1978, to consolidate the contract compliance program--now the responsibility of Labor and eleven "compliance agencies"--into the Labor Department (1,517 positions and $33.1 million shifted).
 
 
 116
 These proposed transfers and consolidations reduce from fifteen to three the number of Federal agencies having important equal employment opportunity responsibilities under Title VII of the Civil Rights Act of 1964 and Federal contract compliance provisions.
 
 
 117
 Each element of my Plan is important to the success of the entire proposal.
 
 
 118
 By abolishing the Equal Employment Opportunity Coordinating Council and transferring its responsibilities to the EEOC, this plan places the Commission at the center of equal employment opportunity enforcement. With these new responsibilities, the EEOC can give coherence and direction to the government's efforts by developing strong uniform enforcement standards to apply throughout the government: standardized data collection procedures, joint training programs, programs to ensure the sharing of enforcement related data among agencies, and methods and priorities for complaint and compliance reviews. Such direction has been absent in the Equal Employment Opportunity Coordinating Council.
 
 
 119
 Transfer of the Civil Service Commission's equal employment opportunity responsibilities to EEOC is needed to ensure that: (1) Federal employees have the same rights and remedies as those in the private sector and in State and local government; (2) Federal agencies meet the same standards as are required of other employers' and (3) potential conflicts between an agency's equal employment opportunity and personnel management functions are minimized. The Federal government must not fall below the standard of performance it expects of private employers.
 
 
 120
 It should be stressed, however, that affected agencies will be consulted before EEOC takes any action. When the Plan has been approved, I intend to issue an Executive Order which will provide for consultation, as well as a procedure for reviewing major disputed issues within the Executive Office of the President. The Attorney General's responsibility to advise the Executive Branch on legal issues will also be preserved.
 
 
 121
 The Civil Service Commission has in the past been lethargic in enforcing fair employment requirements within the Federal government. While the Chairman and other Commissioners I have appointed have already demonstrated their personal commitment to expanding equal employment opportunity, responsibility for ensuring fair employment for Federal employees should rest ultimately with the EEOC.
 
 
 122
 We must ensure that the transfer in no way undermines the important objectives of the comprehensive civil service reorganization which will be submitted to Congress in the near future. When the two plans take effect, I will direct the EEOC and the CSC to coordinate their procedures to prevent any duplication and overlap.
 
 
 123
 The Equal Pay Act now administered by the Labor Department, prohibits employers from paying unequal wages based on sex. Title VII of the Civil Rights Act, which is enforced by EEOC, contains a broader ban on sex discrimination. The transfer of Equal Pay responsibility from the Labor Department to the EEOC will minimize overlap and centralize enforcement of statutory prohibitions against sex discrimination in employment.
 
 
 124
 The transfer will strengthen efforts to combat sex discrimination. Such efforts would be enhanced still further by passage of the legislation pending before you, which I support, that would prohibit employers from excluding women disabled by pregnancy from participating in disability programs.
 
 
 125
 There is now virtually complete overlap in the employers, labor organizations, and employment agencies covered by Title VII and by the Age Discrimination in Employment Act. This overlap is burdensome to employers and confusing to victims of discrimination. The proposed transfer of the age discrimination program from the Labor Department to the EEOC will eliminate the duplication.
 
 
 126
 The Plan I am proposing will not affect the Attorney General's responsibility to enforce Title VII against State or local governments or to represent the Federal government in suits against Federal contractors and grant recipients. In 1972, the Congress determined that the Attorney General should be involved in suits against State and local governments. This proposal reinforces that judgment and clarifies the Attorney General's authority to initiate litigation against State or local governments engaged in a "pattern or practice" of discrimination. This in no way diminishes the EEOC's existing authority to investigate complaints filed against State or local governments and, where appropriate, to refer them to the Attorney General. The Justice Department and the EEOC will cooperate so that the Department sues on valid referrals, as well as on its own "pattern or practice" cases.
 
 
 127
 A critical element of my proposals will be accomplished by Executive Order rather than by the Reorganization Plan. This involves consolidation in the Labor Department of the responsibility to ensure that Federal contractors comply with Executive Order 11246. Consolidation will achieve the following: promote consistent standards, procedures, and reporting requirements; remove contractors from the jurisdiction of multiple agencies; prevent an agency's equal employment objectives from being outweighed by its procurement and construction objectives; and produce more effective law enforcement through unification of planning training and sanctions. By 1981, after I have had an opportunity to review the manner in which both the EEOC and the Labor Department are exercising their new responsibilities, I will determine whether further action is appropriate.
 
 
 128
 Finally, the responsibility for enforcing grant-related equal employment provisions will remain with the agencies administering the grant programs. With the EEOC acting as coordinator of Federal equal employment programs, we will be able to bring overlap and duplication to a minimum. We will be able, for example, to see that a university's employment practices are not subject to duplicative investigations under both Title IX of the Education Amendments of 1972 [section 1681 et seq. of Title 20, Education] and the contract compliance program. Because of the similarities between the Executive Order program and those statutes requiring Federal contractors to take affirmative action to employ handicapped individuals and disabled and Vietnam veterans, I have determined that enforcement of these statutes should remain in the Labor Department.
 
 
 129
 Each of the changes set forth in the Reorganization Plan accompanying this message is necessary to accomplish one or more of the purposes set forth in Section 901(a) of Title 5 of the United States Code. I have taken care to determine that all functions abolished by the plan are done only under the statutory authority provided by Section 903(b) of Title 5 of the United States Code.
 
 
 130
 I do not anticipate that the reorganization contained in this Plan will result in any significant change in expenditures. They will result in a more efficient and manageable enforcement program.
 
 
 131
 The Plan I am submitting is moderate and measured. It gives the Equal Employment Opportunity Commission--an agency dedicated solely to this purpose--the primary Federal responsibility in the areas of job discrimination, but it is designed to give this agency sufficient time to absorb its new responsibilities. This reorganization will produce consistent agency standards as well as increased accountability. Combined with the intense commitment of those charged with these responsibilities, it will become possible for us to accelerate this Nation's progress in ensuring equal job opportunities for all our people.
 
 JIMMY CARTER
 
 132
 THE WHITE HOUSE,
 
 
 133
 February 23, 1978.
 
 
 
 *
 Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, Southern Division, sitting by designation
 
 
 [1]
 See Appendix I for complete text of Reorganization Plan No. 1 of 1978
 
 
 [2]
 See note 7, infra
 
 
 [3]
 For the fiscal year 1983, Congress appropriated funds "[f]or necessary expenses of the Equal Employment Opportunity Commission as authorized by Title VII of the Civil Rights Act of 1964, as amended, 29 U.S.C. 206(d) and 621-634...." Act of Dec. 21, 1982, Pub.L. No. 97-377, 96 Stat. 1830, 1874. In 1981 Congress appropriated a sum not to exceed $18,500,000 "for payments to State and local enforcement agencies for services to the Commission pursuant to Title VII of the Civil Rights Act, as amended, and sections 6 and 14 of the Age Discrimination in Employment Act." Act of Dec. 15, 1981, Pub.L. No. 97-92, 95 Stat. 1183, 1192 (1981). See also, Act of Nov. 28, 1983, Pub.L. No. 98-166, 97 Stat. 1071, 1088 (Appropriations for 1984 fiscal year containing reference identical to that for 1983 appropriation)
 
 
 [4]
 See e.g., Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations for 1980: Hearings before a Subcommittee of the House Committee on Appropriations, 96th Cong., 1st Sess. 79-81, 97-104, 110-11, 120, 139, 145, 150 (1979); Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations, Fiscal Year 1980: Hearings Before the Subcommittee of the Senate Committee on Appropriations, (Part 2) 96th Cong., 1st Sess. 1493, 1495, 1499, 1500-05, 1517-19, 1532 (1979); Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations for 1981: Hearings Before a Subcommittee of the House Committee on Appropriations, (Part 8) 96th Cong.2nd Sess. 241, 243; Departments of State, Justice, Commerce, the Judiciary, and Related Agencies Appropriations for 1982: Hearings Before the Senate Committee on Appropriations (Part 2), 97th Cong., 1st Sess. 242-43
 
 
 [5]
 See, e.g., EEOC v. Hernando Bank, 724 F.2d 1188 (5th Cir.1984) (EEOC has authority to enforce Equal Pay Act; one-House veto provision of Reorganization Act of 1977 unconstitutional but severable); EEOC v. Pan American World Airways, 576 F.Supp. 1530 (S.D.N.Y.1984) (Reorganization Act of 1977 unconstitutional and, therefore, compliance with subpoena stayed); Allen v. Carmen, 578 F.Supp. 951 (D.C.D.C.1983) (One-House veto provision of the Presidential Records and Materials Preservation Act unconstitutional but severable; regulations revised by virtue of the exercise of the veto power were invalid); In re Dept. of Energy Stripper Well Exemption Litigation, 578 F.Supp. 586 (D.Kan.1983) (District Court not authorized to rule on constitutionality of Energy Petroleum Allocation Act and Energy Policy and Conservation Act; issue certified to the Temporary Emergency Court of Appeals); EEOC v. Allstate Ins. Co., 570 F.Supp. 1224 (S.D.Miss.1983) (Reorganization Act of 1977 unconstitutional and provision cannot be severed; ratification argument likewise rejected)
 
 
 [6]
 See Reorganization Plan No. 1 of 1978, supra, reproduced in Appendix I
 See also, Appendix II for the complete text of the Message of the President transmitted with Reorganization Plan No. 1 of 1978, reprinted at 5 U.S.C.App. at 113 (Supp.1984). The message of the President outlines the purpose of the transfer of enforcement authority.
 
 
 [7]
 Four days of hearings regarding the transfer were conducted by the Senate Committee on Government Affairs. See S.Rep. No. 95-750, 95th Cong., 2nd Sess., 5. Four days of hearings were also held by the House Subcommittee of the Committee on Government Operations. H.Rep. No. 95-1069, 95th Cong., 2nd Sess., 2 ("During the hearings ... the new Chairperson of the EEOC [was] interrogated closely on these matters. The committee is satisfied that with effective leadership the Commission will be able to carry out all its duties.")
 See also, Reorganization Plan No. 1 of 1978: Hearings Before the Committee on Governmental Affairs of the United States Senate, 95th Cong., 2nd Sess. (1978); Reorganization Plan No. 1 of 1978 (Equal Employment Opportunity); Hearings Before A Subcommittee of the House Committee on Government Operations, 95th Cong., 2nd Sess. (1978). See also Discrimination in the Federal Government: Hearings Before the Sub-Committee on Investigations of the House Committee on Post Office and Civil Service, 95th Cong., 2nd Sess. (1978).
 
 
 [8]
 The Reorganization Act of 1977 was a compromise between bills sponsored by the Administration (S. 626, H.R. 3047 and H.R. 3442) and a bill drafted by Representative Jack Brooks (H.R. 3131). The former bills were drawn along the lines of past reorganization bills and contained a one-House veto and broad delegations of power. The bill proposed by Representative Brooks made enactment of a Reorganization Plan contingent upon approval by vote of both houses and signature of the President. H.R. 3131 was rejected because Congress wanted to expedite the reorganization. The bills sponsored by the Administration were rejected as an overbroad delegation. See H.R.Rep. No. 95-105, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Ad.News 41
 The House Report concludes as follows:
 The committee recommends that the President be delegated limited authority to reorganize the Federal Government. Under the authority, the President would submit reorganization plans to the Congress which would become effective after 60 days unless either House of Congress has adopted a resolution disapproving such plan. Procedures assuring a vote on each plan if any Member of Congress asks for it, are incorporated in the bill.
 In the course of the hearings on this legislation, the constitutionality of the key provision of this bill was questioned. It was contended that the bill makes too broad a delegation of legislative authority to the President by permitting plans submitted by the President to become law without the approval of Congress.
 The question remains unresolved, but it is the position of the committee that the risk of an unfavorable ruling by the courts, while still remaining, may have been lessened by the adoption of the new voting procedure and the added limitations on the use of the reorganization authority.
 It is the intention of the committee to examine carefully each reorganization plan submitted under this authority and to assure the participation of Congress in the reorganization process to the fullest extent possible.
 H.R.Rep. No. 95-105, supra at 17, 1977 U.S.Code Cong. & Ad.News at 57. (emphasis supplied)
 
 
 [9]
 Panama Refining Co. v. Ryan, supra and Schechter, supra, are the only cases in which the Supreme Court has held invalid a delegation of power to a governmental authority. 1 Davis, Administrative Law Treatise Sec. 3:8 (2d Ed.1978). Davis opines that the Panama decision would not be followed today and is explainable only by two extraneous factors: 1) broad delegation in other parts of the Act and 2) criminal penalties for violation code provisions the content of which were not readily ascertainable
 The Schechter case involved a broad delegation of authority to approve "codes of fair competition" to govern all business subject to federal authority. "In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered." 295 U.S. at 541-42, 55 S.Ct. at 848-49.
 
 
 [10]
 The authority to reorganize was originally granted for three years from the date of enactment but was later extended to four years by amendment. See 5 U.S.C. Sec. 905(b) (Supp.1984)
 
 
 [11]
 An amicus argues that the Reorganization Act is an invalid delegation of authority because it contains insufficient limitations of Sec. 905, citing the remarks of Professor Tribe reprinted in the House Report No. 95-105. Professor Tribe expressed some concern that the President could alter substantive rights by inappropriate transfers of functions. Professor Tribe's full remarks are found at H.R.Rep. No. 95-105, supra at 15-17, 1977 U.S.Code Cong. & Ad.News at 55-56
 This argument overlooks the direction given the President in Secs. 901 and 903 and assumes that the President might not act in good faith. Section 901(a)(1) says that the purpose of the Act is "to promote the better execution of the laws, the more effective management of the executive branch and of its agencies and functions, and the expeditious administration of the public business." Subsections (a)(4), (5) and (6) discuss grouping and consolidating similar functions "according to major purposes" to eliminate duplication. The policies outlined in this section are clear. An inappropriate transfer affecting substantive rights would violate the purpose of promoting the better execution of the laws in Sec. 901(a)(1) and possibly the purpose of consolidating similar functions "according to major purposes" of subsections (a)(4) and (5). Inappropriate transfers might also violate the prohibition of Sec. 903(a)(2) that no enforcement function or statutory program can be eliminated by the plan. If substantive rights were affected by the transfer, the specific transfer of authority might be subject to the charge that it effectively eliminated all or part of an enforcement function.